UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

_____
                                   :
**TIMEA CILLIKOVA,**               :
                                   :
   *Petitioner,*    :  Civil Action No. 15-2823
                                   :
   v.                :
                                   :  **OPINION**
**PAUL CILLIK,**                   :
                                   :
   *Respondent*.    :
_____:

**ARLEO, UNITED STATES DISTRICT JUDGE**

 **I. INTRODUCTION**

  This matter is before the Court on Petitioner's Verified Petition for Return of P.C. and Pa.C. (the "Children") to the Slovak Republic pursuant to the Convention on the Civil Aspects of International Child Abduction, done at the Hague on October 25, 1980 (the "Convention"), and the International Child Abduction Remedies Act ("ICARA"), 42 U.S.C. §§ 11601 *et seq.* (the "Petition") and Respondent's motion to dismiss.  Following their parents' lawful divorce in Slovakia, the Children lived with their father there, attended school there, and visited with their mother on weekends and holidays.  Without any notice to or consent of their mother, their father removed them from Slovakia on October 14, 2015, and brought them to New Jersey, where they have lived ever since.  By this petition, their mother, Petitioner Timea Cillikova seeks their return to Slovakia, which Respondent, their father, opposes.

  The Court held an evidentiary hearing on August 4, 2015.  This Opinion and Order constitutes the Court's findings of fact and conclusions of law pursuant to Fed. R. Civ. P. 52.

For the reasons set forth herein, the Petition is **GRANTED** and the motion to dismiss is **DENIED.**

## II. FACTUAL FINDINGS

Petitioner Timea Cillikova is the Children's mother and Respondent Paul Cillik is their father. Both Petitioner and Respondent hold dual citizenship in the United States and Slovakia. Petitioner and Respondent were married in New York in 1990 and again in the Slovak Republic in 2001. Before 2004, the parties lived in the United States. P.C. was born here in 2003. In 2004, when Petitioner was pregnant with Pa.C., Petitioner and Respondent traveled to the Slovak Republic where Pa.C. and the family remained. Petitioner and Respondent bought a home (which they rented out for income), rented a home in Rimavska Sobota, Slovakia, and Respondent obtained employment. Having been raised in Slovakia, both Petitioner and Respondent had extended family and friends there.

The parties' relationship began to deteriorate in 2006, but the parties dispute what caused this deterioration. Petitioner claims Respondent's involvement in an online pornographic chat website business created the tension, especially once Respondent's conduct became common knowledge in their conservative community. Petitioner further asserts that during this period Respondent became abusive, in one instance threating to kill her with a knife. Petitioner claims she began to live in fear and anxiety, which led to her experiencing mental health issues.

Respondent denies that he was involved in running this website (rather the people to whom they rented their house were involved) but instead worked as an electrician and contractor. He further claims that Petitioner's mental health problems were not the result of, but instead the cause of, their marital difficulties.

On three occasions between 2009 and 2013, Plaintiff received medical treatment, and/or was hospitalized for her mental health problems.

In 2009, Petitioner first filed for divorce in Slovakia. This application was not adjudicated due to Petitioner's hospitalization during this period.

In 2011, Respondent moved with the Children to Bratislava, Slovakia, because of a job opportunity. While Petitioner testified that she was not happy with the move, she did not object because she could still visit the Children on a regular basis.

Also in 2011, Petitioner again filed for divorce and originally sought joint custody. In October 2013, however, Petitioner offered a settlement proposal in which the children would be "placed in the custody of [Respondent]" and she would be granted visitation rights. P-20. Petitioner claims she offered this compromise because the judge in that proceeding commented that the Children would have better opportunities in Bratislava, she had limited financial resources, and was being treated for mental health issues.

In November 2013, a Divorce Judgment in Slovakia was entered. See P-2. In this document, Respondent was awarded "personal custody" of the children and Petitioner was granted visitation rights on certain weekends, school breaks, and holidays. Id. The Divorce Judgment also provided that, "**[b]oth parents are entitled to represent the minor children and manage their property.**"

The Children were settled in their lives in Slovakia. They enrolled in school, participated in extracurricular activities, and spent time with relatives and friends. They lived with their father, but also visited with their mother, who was engaged in their lives. While Respondent disputes the frequency of Petitioner's visitations, it is undisputed that Petitioner did to some extent exercise her visitation rights, interacted with the Children's teachers, visited the Children

at school, and had communications with the school staff. All of Petitioner's visits were unsupervised.

Respondent removed the Children from the Slovak Republic to the United States on or about October 14, 2014. Respondent testified that he had plans to travel to the United States alone, and decided to take the children with him just days before, when the children, then ages 9 and 11, told him: "Father we are ready to go to the U.S." Respondent admits that he did not seek permission from Petitioner or otherwise advise her that he was leaving with the Children. Nor did he tell anyone at the Children's school or any other family members. After arriving, he rented an apartment and decided to stay permanently in New Jersey with the Children, his new wife, and their daughter. He enrolled the Children in the local public school. See P-13.

Petitioner learned about the Children's removal after she unable to reach them on their cellphones and their school advised her that they were not there. Several days after he removed the Children, Respondent sent Petitioner an email advising her of the move. Shortly after the Children's removal, Petitioner filed a Request for Return. See P-4.

In 2014, before Respondent removed the Children, he moved for an increase in child support payments and changes to Petitioner's visitation rights. That case was stayed pending the outcome of this case, but the Slovak court did issue a Resolution in which it concluded Respondent violated the Slovak Family Code by removing the Children without Petitioner's consent. P-19.

### III. BACKGROUND OF THE CONVENTION

The two main purposes of the Hague Convention are "to ensure the prompt return of children to the state of their habitual residence when they have been wrongfully removed," Convention, pmbl., and "to ensure that rights of custody and of access under the law of one

4

Contracting State are effectively respected in the other Contracting States," id., art. 1. The Convention's procedures are not designed to settle international custody disputes, but rather to restore the status quo prior to any wrongful removal or retention, and to deter parents from engaging in international forum shopping in custody cases. Baxter v. Baxter, 423 F.3d 363, 367 (3d Cir. 2005). Any person seeking the return of a child in the United States may commence a civil action under the Convention by filing a petition in a court of the jurisdiction in which the child is located. 42 U.S.C. § 11603(b). To obtain an order for the child's return, the petitioner bears the burden of proving by a preponderance of the evidence that the removal or retention was wrongful under Article 3 of the Convention. 42 U.S.C. § 11603(e)(1)(A). Under Article 3, the removal or retention of a child is "wrongful" where:

> (a) it is in breach of rights of custody attributed to a person, an institution or any other body, either jointly or alone, under the law of the State in which the child was habitually resident immediately before the removal or retention; and
>
> (b) at the time of removal or retention those rights were actually exercised, either jointly or alone, or would have been so exercised but for the removal or retention.

Convention, art. 3.

### IV.   STANDARD OF REVIEW FOR PETITIONER'S CASE

When adjudicating a petition under Article 3 of the Convention, the Court must consider four issues:

> (1) when the removal or retention at issue occurred;
>
> (2) the country in which the child was habitually resident prior to the removal or retention;
>
> (3) whether the removal or retention breached the custody rights of the petitioner; and

5

> (4) whether the petitioner was exercising those custody rights at the time of the removal or retention.

De La Vera v. Holguin, No. 14-4372, 2014 WL 4979854, at *6 (D.N.J. Oct. 3, 2014) (citing Baxter, 423 F.3d at 368). Petitioner must establish a *prima facie* case of wrongful removal or retention by a preponderance of the evidence. Id. (citing 42 U.S.C. § 11603(e)(1)(A)).

Here, on October 14, 2014, Respondent removed the Children from the Slovak Republic. At that time, they were habitual residents of Slovakia. They lived there, attended school there, and engaged in extracurricular activities. Additionally, both children are under the age of 16. Respondent does not dispute these facts.

Respondent disputes that the Children's removal breached any of Petitioner's custody rights or that Petitioner was exercising those rights at the time of removal or retention. He also argues that Petitioner lacked any "right of custody" at all and, therefore, that the Petition should be denied and the Court should dismiss this action for lack of jurisdiction. This Court disagrees.

"Right of custody" is a term of art defined in Article 5 of the Convention: "'[R]ights of custody' shall include rights relating to the care of the person of the child and, in particular, the right to determine the child's place of residence." Such rights "may arise in particular by operation of law or by reason of a judicial or administrative decision, or by reason of legal effect under the law of [the State in which the child was habitually residing]." Convention, art. 3. Therefore, the Court must consult Slovak law, judicial determinations, and agreements having legal effect in the Slovak Republic to identify the scope of Petitioner's rights and then determine, under the Convention's text and structure, whether any of those rights constitute a "right of custody." Abbott v. Abbott, 560 U.S. 1, 10 (2010).

In Abbott, the United States Supreme Court held that "rights of custody" include more than the right of physical custody. Id. In that case, a mother removed her son from Chile to the

6

United States and the child's father moved for the child's return. Id. at 6. The Chilean courts had granted mother daily care and control of the child and awarded the father "direct and regular" visitation rights. Id. A Chilean court had also provided the father a *ne exeat* right, which is a right requiring the father's consent prior to the child's removal from the country. Id. The Supreme Court concluded that because the petitioner-father had been granted the right to determine the child's place of residence, he had a "right of custody" under the Convention. Id. at 11. *Ne exeat* rights established by legal codes also constitute "rights of custody." See Font Paulux v. Vittini Cordero, No. 12-986, 2012 WL 2524772, at *5 (M.D. Pa. June 29, 2012); see also Garcia v. Varona, 806 F. Supp. 2d 1299, 1310 (N.D. Ga. 2011) ("A parent who has authority under the law of the state of habitual residence to make decisions regarding the personal care, protection, maintenance, and finances of the child, possesses rights of custody that fall within the ambit of decisions relating to 'the care of the person of the child' within the meaning of Article 5 of the Convention.") (citing Hanley v. Roy, 485 F.3d 641, 657 (11th Cir. 2007)); De La Vera, 2014 WL 4979854, at *9.

The Slovak Family Code § 28 states that "parental rights and obligations" include: (a) continual and consistent personal care for upbringing, health, maintenance, and all-around development of the child; (b) representation of the child; and (c) administration of the child's property." P-9. These rights are to be exercised by both parents. Id. Section 35 further provides:

> If parents fail to agree on substantive matter in the exercise of their parental right and obligations, in particular on moving the minor child abroad . . . the court shall decide on the motion of some parent.

Id. § 35; see also P-10 at § 2 (stating that parental rights and obligations "clearly includes the right to determine where the child shall live"); P-21.

7

Based upon the foregoing, the Court concludes that, absent any modifications by a Slovak court or agreement of the parties, Slovak law provided Petitioner with "rights of custody," including a *ne exeat* right, or right to determine the Children's country of residence.

This Court is also satisfied that the parties Divorce Judgment reaffirmed the rights already provided by Slovak law. Here, the Divorce Judgment awarded sole physical custody to Respondent, but also provided that "[b]oth Parents have right to represent minor children and administer their property." P-2. "Representation of the child" and "administration of the child's property" are two of the "parental rights and obligations" set forth in Section 28 of the Slovak Family Code. See P-9. Thus, under a plain reading of the Divorce Judgment, Petitioner retained some of her "parental rights and obligations."

Further confirming that the Divorce Judgment did not divest her of her "parental rights and obligations," is a March 11, 2015, Resolution (the "Resolution") from the Bratislava Court. See P-19. This Resolution was issued in response to Respondent's 2014 application to modify the Divorce Judgment to increase child support and following the Children's removal to the United States. In this document the Court states:

> Even though the minors are in the custody of the father their mother is not restricted from not limited in the performance of her parental rights and obligations. Their father failed to inform the mother about leaving and taking the minors to the USA and he failed to ask her previous consent. **Thus, the father has strongly limited the mother in the performance of her rights and obligations towards the minors when he disabled her from meeting the minors in a regular way, the way it should be if the minors lived in Slovakia.**
>
> The change of relations of the minors was then caused intentionally by father's acting contrary to provision § 35 of Family Act although it is not within the competence of this court to evaluate the father moving the minors as illegal.

Id. (emphasis added).

8

Finally, at trial, Respondent himself stated that Petitioner had "parental rights," which included providing support, access to the Children's schools, and managing their property.[1]

The Court therefore concludes that the Divorce Judgment did not completely divest Petitioner of her "parental rights and obligations," including her *ne exeat* right. Instead, the Divorce Judgment expressly reaffirmed that Petitioner retained the right to represent the children and administer their property. Thus, Petitioner possessed rights of custody as of October 2014. See Abbott, 560 U.S. at 21; Garcia, 806 F. Supp.2d at 1310.

The Court next turns to the third consideration in Petitioner's *prima facie* case: whether the removal or retention breached Petitioner's custody rights. Clearly, removing the Children without obtaining Petitioner's consent violated, at a minimum, Petitioner's *ne exeat* right. See Abbott, 560 U.S. at 21.

Finally, the Court addresses whether Petitioner was exercising her rights when the Children were removed. "Very little is required of the applicant in support of the allegation that custody rights have actually been or would have been exercised. The applicant need only provide some preliminary evidence that he or she actually exercised custody of the child, for instance, took physical care of the child." In re Adan, 437 F.3d 381, 391 (3d Cir. 2006). Here, while Respondent disputes the frequency of Petitioner's visitations, it is undisputed that Petitioner did exercise her visitation rights to some extent, interacted with the Children's teachers, visited the Children at school, and communicated with school staff. Furthermore, as the Supreme Court noted in Abbott, *ne exeat* rights are inchoate and cannot be exercised until a child is removed from the habitual state. Abbott, 560 U.S. at 13. Thus, Respondent's removal of

---

[1] The only evidence that Respondent offered in support of his narrow construction of the Divorce Judgment is a self-serving affidavit from his own attorney in the Slovak Republic. P-11. However, the attorney never stated that the Divorce Judgment stripped Respondent of all of her rights and he even admits that "both parents have parental rights and obligations." Id.

9

the Children without Petitioner's consent was "an instance where the right would have been exercised but for the removal or retention." Id. (internal quotation omitted). Therefore, the Court concludes that Petitioner has satisfied this element.

Based upon the foregoing, the Court finds that Petitioner has met her *prima facie* burden[2] and now turns to Respondent's affirmative defenses.

## V. AFFIRMATIVE DEFENSES

### a. Physical or Psychological Harm or Intolerable Situation

Article 13(b) provides:

> Notwithstanding the provisions of the preceding Article, the judicial or administrative authority of the requested State is not bound to order the return of the child if the person, institution or other body which opposes its return establishes that – there is a grave risk that his or her return would expose the child to physical or psychological harm or otherwise place the child in an intolerable situation.

Grave risk of harm must be proven by clear and convincing evidence and this defense is "narrowly drawn." In re Adan, 437 F.3d 381, 394 (3d Cir. 2006). The Third Circuit has explained:

> The exception has been held to apply in at least two sets of cases: when return of the child puts the child in imminent danger ... e.g., returning the child to a zone of war, famine, or disease ... [and in] cases of serious abuse or neglect, or extraordinary emotional dependence, when the court in the country of habitual residence, for whatever reason, may be incapable or unwilling to give the child adequate protection.
>
> . . . .
>
> At one end of the spectrum are those situations where repatriation might cause inconvenience or hardship, eliminate certain educational or economic opportunities, or not comport with the child's preferences; at the other end of the spectrum are those

---

[2] For the same reasons, respondent's motion to dismiss for lack of jurisdiction is denied.

10

> situations in which the child faces a real risk of being hurt, physically or psychologically, as a result of repatriation. The former do not constitute a grave risk of harm under Article 13(b); the latter do.

Baxter, 423 F.3d at 373 (quotations and citations omitted).[3]  When considering whether an Article 13(b) exception applies, the Court "must take into account any ameliorative measures (by the parents and by the authorities of the state having jurisdiction over the question of custody) that can reduce whatever risk might otherwise be associated with a child's repatriation." Adan, 437 F.3d at 395-96.  Even if a court concludes that authorities in the country of habitual residence are capable of safeguarding the child, however, "it must still carefully tailor its order to counter whatever risk of harm exists—including returning the child in the custody of the parent who removed the child— thus reducing or eliminating the risk of harm that might otherwise be associated with granting [the] petition." Id. (internal quotation omitted).

Here, Respondent argues this defense applies based upon: (1) Petitioner's mental health issues and (2) the Slovak Republic's proximity to Ukraine and potential threats of terrorism.

---

[3] The Department of State has provided additional guidance as to when this defense applies:

> A review of deliberations on the Convention reveals that "intolerable situation" was not intended to encompass return to a home where money is in short supply, or where educational or other opportunities are more limited than in the requested State. An example of an "intolerable situation" is one in which a custodial parent sexually abuses a child. If the other parent removes or retains the child to safeguard it against further victimization, and the abusive parent them petitions for the child's return under the Convention, the court may deny the petition. Such action would protect the child from being returned to an "intolerable situation" and subjected to a grave risk of psychological harm.

51 Fed. Reg. at 10,510.

As to Petitioner's mental health issues, the Court concludes Respondent has not demonstrated by clear and convincing evidence that Petitioner's mental condition creates a "grave risk of harm" to her children. First, there was absolutely no evidence offered at trial regarding Petitioner's present mental health or how, if the children are returned to Slovakia, her continued visits and involvement in their lives would cause them "grave harm." It bears noting that for five years prior to the Children's removal, Petitioner was allowed unsupervised visits with her Children. The Slovak courts were aware of Petitioner's mental health issues – this was at issue in the divorce proceeding – and nonetheless ordered regular, unrestricted visitation. In addition, Petitioner testified that her mental health has improved since the divorce and has submitted a declaration from her treating psychiatrist, Maria Prochazkova, in which Dr. Prochazkova states that Petitioner's condition has been "stabilized" since 2013. See P-22. Indeed, Respondent testified that if Petitioner relocates to New Jersey, he would permit regular unrestricted visitation with the Children. How then can he claim that Petitioner's mental health would place the Children in danger if she resumed visits in the Slovak Republic?

Thus, the Court concludes Respondent has failed to demonstrate by clear and convincing evidence that Petitioner's mental health issues would present a grave risk to the Children if they are returned to Slovakia. See Baxter, 423 at 374 n.9 (common challenges to the fitness of one parent as a guardian, such as allegations of alcoholism, are better left to the adjudication of the home-state's family court system); Bowen v. Bowen, No. 13-731, 2014 WL 2154905, at *11 (W.D. Pa. May 22, 2014) (denying grave risk of harm challenge even when Child Protective Services had investigated allegations of abuse at home and the child had experienced some degree of racism in school); Clarke v. Clarke, No. 08-690, 2008 WL 2217608, at *9 (E.D. Pa. May 27, 2008) (denying grave risk of harm challenge even though authorities in Australia had

12

investigated allegations of sexual assault by the father, in part because the Australian authorities could address any future allegations of such conduct).

Respondent claims that the children would be placed in an "intolerable situation" or exposed to a "grave risk of harm" if returned to Slovakia likewise fails. At trial, the only evidence to support this claim was Respondent's own vague testimony about emails he allegedly received from the Department of State "warning of acts of terror" in the Slovak Republic. None of these "warnings" was admitted into evidence or placed in context. No evidence of "imminent danger" was placed before the Court. Respondent himself conceded that the Slovak Republic is not currently experiencing any famine or war. Petitioner countered with the current State Department travel advisory that "Slovakia remains largely free from terrorist activity." Thus, the Court concludes that the return of the Children to the Slovak Republic would not constitute a grave risk of harm or intolerable situation.

### b.  Consent or Acquiescence

Article 13(a) of the Convention provides:

> The judicial or administrative authority of the requested State is not bound to order the return of the child if the person, institution or other body which opposes its return establishes that . . . the person, institution or other body having care of the person of the child . . . had consented to or subsequently acquiesced in the removal or retention.

Consent and acquiescence are separate defenses, both should be interpreted narrowly, and both must be proved by a preponderance of the evidence. Baxter, 423 F.3d at 371. "The consent defense involves the petitioner's conduct prior to the contested removal or retention, while acquiescence addresses whether the petitioner subsequently agreed to or accepted the removal or retention." Id.

*1. Acquiescence*

"The defense of acquiescence has been held to require an act or statement with the requisite formality, such as testimony in a judicial proceeding; a convincing written renunciation of rights; or a consistent attitude of acquiescence over a significant period of time." Id. (internal quotation omitted). "[T]he acquiescence inquiry turns on the subjective intent of the parent who is claimed to have acquiesced." Id.

It is clear that Petitioner has not acquiesced. The evidence demonstrates that Petitioner, weeks after learning of the Children's removal, began the process of seeking their return under the Convention. See P-4; see also Clarke, 2008 WL 2217608, at *7 ("Further, Mr. Clarke filed a custody action immediately upon learning that Mrs. Clarke planned to remain in the United States with the children. Mr. Clarke never made any statements that the retention of the children was permissible and at no time acted in a manner that would imply he acquiesced to the wrongful retention of the children."). Respondent conceded at trial that when he finally spoke to Petitioner after he had removed the Children, she continued to dispute the removal. The fact that Petitioner may have sought a stay of the proceedings in the Slovak Republic pending resolution of the instant matter, this does not demonstrate acquiesce in any way, shape, or form. Respondent has not offered a statement in a judicial proceeding, a written renunciation, or any other act or statement with the requisite formality that suggests that Petitioner, since the Children were removed, has acquiesced to their removal.

*2. Consent*

> Consent need not be expressed with the same degree of formality as acquiescence in order to prove the defense under article 13(a). Often, the petitioner grants some measure of consent, such as permission to travel, in an informal manner before the parties become involved in a custody dispute. The consent and acquiescence inquiries are similar, however, in their focus on the

>petitioner's subjective intent. In examining a consent defense, it is important to consider what the petitioner actually contemplated and agreed to in allowing the child to travel outside its home country. The nature and scope of the petitioner's consent, and any conditions or limitations, should be taken into account. The fact that a petitioner initially allows children to travel, and knows their location and how to contact them, does not necessarily constitute consent to removal or retention under the Convention.

Baxter, 423 F.3d at 371.

Respondent conceded at trial that he never obtained Petitioner's consent before removing the children – he never even told her of his plans. Petitioner likewise testified that she did not consent to the Children's removal. The Slovakian Court likewise found that "the father failed to inform the mother about leaving and taking the minors to the USA and he failed to ask her previous consent." P-19. This is not a close call. This defense fails.

### VI. CONCLUSION

For the reasons set forth herein, Petitioner's petition is **GRANTED** and Respondent's motion to dismiss is **DENIED.** Nothing in this Opinion or accompanying Order, however, constitutes a modification of the Divorce Judgment. An appropriate Order shall issue.

*/s Madeline Cox Arleo*
**Hon. Madeline Cox Arleo**
**United States District Judge**